UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

NEW JERSEY THOROUGHBRED
HORSEMEN'S ASSOCIATION, INC.;
ELR CORPORATION; DECKERT
ENTERPRISES LLP #2; and
TIMOTHY HILLS,

        Plaintiffs,

    v.

THE ALPEN HOUSE U.L.C.,

HONORABLE JOSEPH E. IRENAS
CIVIL ACTION NO. 08-613
(JEI/AMD)

**OPINION**

**APPEARANCES:**

LOMURRO, DAVISON, EASTMAN & MUNOZ, P.A.
By:  Gary McLean, Esq.
     Peter Koenig, Esq.
100 Willowbrook Road, Building 1
Freehold, New Jersey 07728
        Counsel for Plaintiffs

STERNS & WEINROTH, P.C.
By:  Robert Zoller, Esq.
     Christopher Torkelson, Esq.
50 West State Street, Suite 1400
P.O. Box 1298
Trenton, New Jersey 08607
        Counsel for Defendant

**IRENAS**, Senior District Judge:

    This diversity suit arises out of an outbreak of Equine

Herpes Virus - Type 1 ("EHV-1") among certain thoroughbred horses

stabled at Monmouth Park racetrack during the last months of

2006.[1]  The source of the infection was later traced back to a

Canadian training facility, Adena Springs North, owned by

Defendant The Alpen House.[2]  Plaintiffs ELR Corporation, and

Deckert Enterprises, LLP #2, whose horses were *not* infected but

were quarantined due to possible infection[3], and the New Jersey

Thoroughbred Horsemen's Association, Inc. (of which the

individual Plaintiffs are members), seek to recover damages for

the effects of the quarantine, asserting theories of strict

liability and negligence.  Defendant moves for summary judgment.

For the reasons stated herein, the Motion will be granted in part

and denied in part.


## I.

"EHV-1 is a virus that is found in most equine populations

throughout the world."  (Torkelson Decl. Ex. O, Expert Report of

---

[1]  This suit was originally brought as a class action.
However, Plaintiffs' Class Certification Motion was denied by
District Judge Cooper on March 14, 2012.

[2]  Defendant disputes that it did in fact cause the EHV-1
outbreak at Monmouth Park.  However, it does not move for summary
judgment on this ground.  Therefore, the Court assumes for
purposes of this Motion only that the EHV-1 infection at Monmouth
Park originated from Defendant's facility and caused the outbreak
at Monmouth Park.

[3]  Horse trainer Timothy Hills, who trained the horses owned
by Plaintiffs Deckert and ELR, is also named as a Plaintiff.  It
appears however, from the Second Amended Complaint and the
parties' briefs, that Hills' claims completely overlap with ELR's
and Deckert's claims.

Veterinarian Nikolaus Osterrieder, p. 3)  EHV-1 infection can
cause "respiratory problems," "spontaneous abortions in pregnant
mares," and "the neurologic form of the virus can reach high
morbidity and mortality rates."[4]  (Torkelson Decl. Ex. M, New
Jersey Dept. of Agriculture Oct. 24, 2006 Memorandum)  The virus
spreads quickly from horse to horse through coughing, sneezing,
or by direct contact with infected horses, feed, or equipment.
(Id.)  "The incubation period of EHV-1 is typically 2 - 10 days."
(Id.)  The parties do not dispute that the industry-wide
standardized response to an EHV-1 outbreak is to limit virus
transmission through biosecurity measures, including quarantines
of infected and potentially infected horses.

     The events leading up to the quarantine began in Ontario,
Canada.  On October 6, 2006, Adena Springs North tested at least
14 of its horses for EHV-1 infection. (McLean Cert. Exs B-K, M,
O-Q).[5]  All of the horses tested negative for the virus.  (Id.)

     Over the course of October 9th, 10th, and 11th, three horses
in Adena Springs North's Barn #1-- Battling, Hitting Hard and

---

     [4]  Clinical signs of neurologic EHV-1 infection include
paralysis, recumbency, and loss of bladder and tail function.
(Torkelson Decl. Ex. M)

     [5]  Defendant contends that the October 6th date reflects a
data entry error in the horses' medical charts; that the EHV-1
tests were actually performed October 25, 2006.  However, the
Court construes the record in the light most favorable to
Plaintiffs (the non-moving party).

Pfifficus-- exhibited "low-grade fevers."  (Torkelson Decl. Ex.
H-- Defendant's Answer to Interrogatory #8)  Pfifficus was one of
the horses who tested negative for EHV-1 on October 6th (McLean
Cert. Ex. E); the other two horses were not tested.

On October 12th, Defendant transported two horses--
Morgenrot and Spring Waltz-- from Adena Springs North to Monmouth
Park.  (Statement of Undisputed Facts "SUF" ¶ 12)  Because the
horses were being imported into the United States, the Canadian
Food Inspection Agency issued Veterinary Health Certificates for
both horses.  (See Torkelson Decl. Exs. I, J)  The certificates
state that the horses were "inspected on the premises of origin
[on October 11, 2006] and found free from evidence of
communicable disease, and insofar as can be determined, has not
been exposed to communicable disease during the sixty (60) days
preceding exportation."  (Id.)

Also, a separate "Certificate of Veterinary Inspection" for
each horse, signed by Adena Springs North's Attending
Veterinarian Dr. Daniel Duncan on October 12, 2006, specifically
states,

> The horse(s) listed on this Certificate of
> Veterinary Inspection (CVI) have not originated from
> nor been stabled on a premise under quarantine or
> restriction due to EHV-1 or from a premise which has
> had equine herpes virus diagnosed during the
> previous 30 day period.

(Id.)  The medical records for Spring Waltz and Morgenrot do not

4

indicate that they were among the horses tested for EHV-1 on October 6, 2006.  (Torkelson Dcel. Exs. I, J)

When Spring Waltz and Morgenrot arrived at Monmouth (on October 12th), their trainer Justin Nixon, put them in Barn 18, took their temperature "as is procedure," and observed nothing "unusual" about either horse.  (Torkelson Decl. Ex. T, Nixon Dep. p. 43)

The next day (October 13th), Northern Emperor, a horse housed in Barn #1 at Adena Springs North, "was found down in his stall."  (SUF ¶ 14; Torkelson Decl. Ex. H-- Defendant's Interrogatory Answer #8)  A neurologic exam was performed, and Northern Emperor was euthanized the same day.  (Torkelson Decl. Ex. K)[6]

The following day, on October 14th-- two days after arriving at Monmouth Park-- Spring Waltz exhibited a high temperature (SUF ¶ 15), which, the parties agree, is often the first clinical symptom of EHV-1 infection.[7]  Spring Waltz's trainer, Justin

---

[6]  The first EHV-1 test reflected in Northern Emperor's medical records is a post-mortem test.  The October 19, 2006 entry reads, "7:19:00 A.M. EHV-1 PCR Post-Mortem / Histology . . . Positive."  (Id.)  See also Torkelson Decl. Ex. H-- Defendant's Interrogatory Answer #8 ("An initial diagnosis of EHV-1 [in Northern Emperor] was made on October 19, 2006, pending completion of a PCR test.")

[7]  A fever also can be a symptom of other viral or bacterial infections.  (Torkelson Decl. Ex. V-- Dr. Keegan Dep. p. 35, 37-38)  Additionally, trainer Justin Nixon testified that "sometimes a horse will run a temperature after they travel."  (Torkelson

Nixon, immediately told both the Monmouth Park veterinarian, Dr. Keegan, and The Alpen House veterinarian, Dr. Duncan, about Spring Waltz's fever.  (SUF ¶¶ 16, 18)[8]

Also on the 14th, back at Adena Springs North, Defendant initiated a quarantine of Barn #1.  (Torkelson Decl. Ex. H-- Defendant's Interrogatory Answer #8)

Three days later (October 17th), another horse at Adena Springs North-- Rock Bird-- was transported to the hospital after exhibiting "neurological symptoms."  (SUF ¶ 19)  Rock Bird's medical chart reads, "10/18/2006 12:00 AM EHV-1 PCR (Blood) . . . Positive."  (Torkelson Decl. Ex. L)[9]

On October 18, 2006, Haygard Equine Medical Institute wrote to Dr. Duncan at Adena Springs North enclosing a "completed biosecurity assessment report pertaining to EHV-1 and your training stables."  (McClean Cert. Ex. R)  There is no other record evidence concerning when the biosecurity assessment was

---

Decl. Ex. T-- Nixon Dep. p. 47)

[8]  Spring Waltz was never diagnosed with EHV-1.  Plaintiff's expert, Dr. Osterrieder, opines that "Morgenrot and Spring Waltz carried the virus from Canada to New Jersey, with EHV-1 possibly, albeit not necessarily, being responsible for the fever of Spring Waltz."  (Torkelson Decl. Ex. O-- Osterrieder Report, p. 6)

[9]  However, Dr. Duncan testified that he did not receive the positive EHV-1 test results for either Rock Bird or Northern Emperor until October 20th or 21st.  (Torkelson Decl. Ex. U-- Duncan Dep. p. 47, 149)  He stated, "[t]hat was my first confirmation of EHV [sic] as a causative agent."  (Id.)

requested, or why it was requested.

On October 22nd, Nixon observed that "several"[10] of his horses in Barn 18 at Monmouth Park had spiked temperatures.  (SUF ¶ 22)  That same day, Dr. Keegan (at Monmouth Park) and Dr. Duncan (at Adena Springs North) spoke on the phone.  (Torkelson Decl. Exs. T, V-- Nixon Dep. p. 51; Keegan Dep. p. 42)  Dr. Keegan testified about his thoughts immediately after speaking to Dr. Duncan:

> A: It worried me. . . that I could have a similar situation [as Adena Springs North].  I could have herpes or something of a neurological effect.  I had five horses with a fever, so obviously it was probably a virus, so yeah, I was concerned.
>
> Q:  Why would you have those thoughts?
>
> A: . . . [B]ecause I had horses come in earlier, I believe a week before from Canada.

(Torkelson Decl. Ex. V-- Keegan Dep. p. 43)  Based on these concerns, Dr. Keegan began voluntary quarantine efforts in Barns 18 and 17[11], and contacted "one of the head [New Jersey] state

---

[10]  Dr. Keegan testified that a total of five horses in Barn 18 exhibited an elevated temperature on October 22nd.  (Torkelson Decl. Ex. V-- Keegan Dep. p. 37).  Nixon testified that on the 22nd, "a couple more horses [in Barn 18] came up with a positive temperature."  (Torkelson Decl. Ex. T-- Nixon Dep. p. 51).

[11]  Nothing in the record indicates that any horses in Barn 17 were ill on the 22nd, or ever became ill.  Dr. Keegan testified that Barn 17 was quarantined because "two or three horses . . . came back and forth between Barn 17 and 18," due to "overflow." (Torkelson Decl. Ex. V-- Keegan Dep. p. 44)

veterinarians" to alert her to a possible "herpes virus"
outbreak.  (Torkelson Decl. Ex. V-- Keegan Dep. p. 43, 45-46)

The next day, October 23rd, "Dr. Keegan began to collect
samples from febrile horses . . . for diagnostic testing." (SUF
¶ 25)  The University of Kentucky Livestock Disease Diagnostic
Center later confirmed that some of those horses tested positive
for EHV-1.  (SUF ¶ 27)

At 10:30 a.m. on October 26, 2006, after receiving the data
from the University of Kentucky, the New Jersey Department of
Agriculture issued a formal quarantine for Monmouth Park.  (SUF ¶
28)[12]  The official memorandum from the New Jersey State
Veterinarian stated that the quarantine would be maintained "for
a minimum of 21 days after the last suspected new infection."
(Torkelson Decl. Ex. A)

The quarantine of Barn 17, where all of the individual
Plaintiffs' horses were housed, lasted until November 18, 2006
(i.e., 24 days). (SUF ¶ 29)  The quarantine of Barn 18 lasted
until December 13, 2006, and Barn 21 was quarantined until

---

[12]  A memorandum from the New Jersey Department of Agriculture
dated October 24, 2006 states that "NJDA Division of Animal
Health, racing commission and racetrack officials have . . .
enact[ed] a quarantine on all facilities housing horses at
Monmouth Park."  (Torkelson Decl. Ex. M)  Given the parties'
apparent agreement that the official quarantine began on the 26th
of October, the Court presumes the quarantine referenced in the
October 24th memorandum is the voluntary quarantine instituted by
Dr. Keegan on the 22nd.

December 19, 2006.[13]  (Id.)  As a result of the quarantine, the individual Plaintiffs' horses were prevented from racing, and therefore lost purse money.[14]

After the quarantine, the NJTHA established the 2006 EHV-1 Emergency Relief Compensation Fund to reimburse owners and trainers for their costs directly associated with the quarantine. (SUF ¶ 30)  The New Jersey Sports and Exposition Authority (NJSEA)[15], with the permission of the New Jersey Racing Commission, gave NJTHA $500,000.00 from the "2006 purse underpay[16]" to create the fund.  (Torkelson Decl. Ex. N)  Through the fund, the individual Plaintiffs were compensated for expenses such as veterinary bills and expenses incurred from implementing "biosecurity measures" to prevent the spread of EHV-1.  (SUF ¶

_____

[13]  Dr. Keegan designated Barn 21 as the "hot barn" which was used to isolate the sick horses. (Torkelson Decl. Ex. W--Osterrider Dep. 116; Torkelson Decl. Ex. Q-- Expert Report of Dr. Tobin p. 13; Torkelson Decl. Ex. N)

[14]  The New Jersey Administrative Code governing horse racing defines "purse race" as "a race for money or any other prize to which the owners of the horses engaged do not contribute." N.J.A.C. 13:70-2.1

[15]  According to its website, the NJSEA operates Monmouth Park Racetrack, the Meadowlands, Giants Stadium, the Atlantic City Convention Center, and a few other large venues in New Jersey. See http://www.njsea.com.  NJSEA conducts "horse race meetings and parimutuel wagering" at Monmouth Park and the Meadowlands. N.J.S.A. 5:10-7.

[16]  Neither Plaintiffs nor Defendant explain what a purse underpay is.  It seems to be extra money remaining after all purse moneys are paid to horse owners.

38; Torkelson Decl. Exs. E - G)[17]  The individual Plaintiffs also submitted claims for lost purses but the fund administrator[18] rejected those claims as "hypothetical expenses."  (Torkelson Decl. Exs. E - G)

The Second Amended Complaint asserts two counts.  The first count asserts that Defendant The Alpen House "is strictly liable both directly as owner of the infected horses, and by virtue of vicarious liability for the strict liability of its trainer [Justin Nixon] for the condition of the horses which caused the illnesses and quarantine."  (Second Amended Compl. ¶ 23)

The second count asserts that The Alpen House "owed a duty to the plaintiffs . . . to properly care for its horses and to promptly notify the officials where its horses were stabled of any adverse conditions of its horses which might affect others," and that The Alpen House "negligently failed to supervise its horses and to immediately notify appropriate persons of the dangerous condition of its animals and is responsible for the failure of its agents to take appropriate and timely action to

---

[17]  Because the individual Plaintiffs have already received compensation for such costs, they do not seek those costs as part of their damages.  However, Plaintiff NJTHA seeks to be reimbursed for those costs which it paid to the individual plaintiffs and others out of the Emergency Fund.

[18]  A committee of three people was "established to oversee, review, and approve/disapprove any potential claims."  (McLean Cert. Ex. AA)

halt the spread of EHV-1."  (Second Amended Compl.  ¶¶ 25-26)

Defendant The Alpen House moves for summary judgment on both counts.

## II.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party.  *See Boyle v. Allegheny Pennsylvania,* 139 F.3d 386, 393 (3d Cir. 1998).  The moving party bears the burden of establishing that no genuine issue of material fact remains.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party.  *See Anderson,* 477 U.S. at 252.

## III.

The Court first addresses the strict liability claim and

then the negligence claim.  Lastly, the Court will address
Defendant's argument that Plaintiff NJTHA lacks standing.


### A.

Plaintiffs advance two theories of strict liability.  First,
they argue that the "Trainer Responsibility Rule," N.J.A.C.
13:70-14A.6(a), imposes strict liability on Defendant's trainer,
Justin Nixon, which is attributable to Defendant on a respondeat
superior theory.

Second, Plaintiffs argue that Defendant is strictly liable
under New Jersey common law.


### 1.

The "Trainer Responsibility Rule" provides,

(a) A trainer shall be the absolute insurer of and
is responsible for the condition of a horse within
his care and custody.

(b) A trainer shall not enter or start a horse that
has in its body any drug or substance foreign to the
natural horse except as otherwise provided for in
these rules and regulations.

(c) A trainer has the duty to be familiar with the
medication rules of this Commission and with any
drug or substances foreign to the natural horse
administered to said horse at his direction or while
in his care and custody.

(d) The trainer, owner, veterinarian, groom or other
person charged with the custody, care and
responsibility of a horse are all obligated to

> protect and guard the horse against administration
> of any drug or substance foreign to the natural
> horse except as otherwise provided for in these
> rules and regulations by any unauthorized
> individual, and the administration of any
> unauthorized drug or substance foreign to the
> natural horse by any person.

N.J.A.C. 13:70-14A.6.

Defendant asserts that this regulation "only applies to the use of foreign substances such as drugs," and does not operate as a catch-all basis to impose liability in a case such as this, involving "a naturally occurring condition" such as a viral infection.  (Moving Brief, p. 10-11)  Plaintiffs, on the other hand, rely on what they assert to be the plain meaning of the statute: "that a trainer is an 'absolute insurer of . . . the condition of' a horse within its care and custody."  (Opposition Brief, p. 27) (quoting N.J.A.C. 13:70-14A.6(a)).

The Court need not resolve this dispute because their claim fails even if Plaintiffs' reading of the regulation is correct. Even assuming *arguendo* that the regulation would impose strict liability on Justin Nixon, and further that Nixon's liability could be imputed to Defendant, Plaintiffs must also establish a right to money damages based on Nixon's violation of an administrative regulation that does not explicitly create a cause of action in favor of Plaintiffs.  In other words, Plaintiffs can only prevail if the Court implies a private right of action in

the Trainer Responsibility Rule.

The New Jersey Supreme Court has instructed,

> [t]o determine if a statute confers an implied
> private right of action, courts consider whether:
> (1) plaintiff is a member of the class for whose
> special benefit the statute was enacted; (2) there
> is any evidence that the Legislature intended to
> create a private right of action under the statute;
> and (3) it is consistent with the underlying
> purposes of the legislative scheme to infer such a
> remedy.

*R.J. Gaydos Insurance Agency, Inc. v. National Consumer Insurance Company*, 168 N.J. 255, 272 (2001).  The Court considers these same factors to determine if an administrative regulation confers an implied private right of action.  *See Jalowiecki v. Leuc,* 182 N.J. Super. 22, 29-31 (App. Div. 1981) (discussed with approval in *R.J. Gaydos*).

Plaintiffs can establish none of the factors.  Nothing suggests that the Trainer Responsibility Rule was enacted to specially benefit or protect other horse owners or trainers. Instead, the rule was promulgated by the New Jersey Racing Commission to protect the integrity of horse racing as "a publicly sponsored sport," as well as "the legalized gambling which accompanies its activities," from "[t]he danger of clandestine and dishonest activity" and "corruption."  *Dare v. State of New Jersey*, 159 N.J. Super. 533, 536-37 (App. Div. 1978).

14

Moreover, there is no evidence that the New Jersey Legislature or the Racing Commission intended to create a private right of action.  Indeed, the regulations provide for enforcement of the Trainer Responsibility Rule by Racing Commission stewards through the imposition of administrative sanctions (such as fines and suspensions), *see* N.J.A.C. 13:70-14A.7, 13:70-16.7, suggesting that no other remedy for violation of the Rule should be implied by the Court.  *See Castro v. NYT Television,* 370 N.J. Super. 282, 293-94 (App. Div. 2004) ("Our Supreme Court has indicated that a court should be especially hesitant in implying a right to a private cause of action against an entity that is subject to such pervasive regulation by a State agency.") (citing *R.J. Gaydos, 168 N.J. at 280-81* (refusing to recognize implied private cause of action against insurance company in light of "comprehensive regulation" of insurance industry); *Campione v. Adamar of New Jersey, Inc.,* 155 N.J. 245, 266 (1998) ("Given the elaborate regulatory scheme" under which casinos operate, the Court "decline[d] to imply a cause of action [against casino] when no such cause of action exist[ed] at common law.")); *see also Jalowiecki*, 182 N.J. Super. at 24 (no private right of action conferred by environmental regulations because Department of Environmental Protection has enforcement authority).

The Court holds that the Trainer Responsibility Rule does

15

not create a private right of action in favor of Plaintiffs. Accordingly, Defendant is entitled to summary judgment on Plaintiffs' strict liability claim insofar as the claim is based on the alleged violation of the Trainer Responsibility Rule.

### 2.

Plaintiffs also argue that Defendant is strictly liable, under New Jersey common law, for shipping Spring Waltz and Morgenrot to Monmouth Park when "it had suspicions that its facility harbored horses with the highly contagious, potentially lethal EHV-1 virus."  (Opposition Brief, p. 29)

Plaintiffs reason, and the Court agrees, that this case is analogous to *DeRobertis v. Randazzo*, 94 N.J. 144, 153 (1983), where the New Jersey Supreme Court held that "[a] plaintiff who can prove that an owner knew of his dog's dangerous propensities is not restricted to a negligence action; that plaintiff may have a cause of action predicated on common-law absolute liability." In reaching that conclusion, the New Jersey Supreme Court relied upon Section 509 of the Restatement (Second) of Torts[19] which provides,

> (1)  A possessor of a domestic animal that he knows or has reason to know has dangerous propensities abnormal to its class, is subject to liability for

---

[19]   *See DeRobertis*, 94 N.J. at 153.

> harm done by the animal to another, although he has
> exercised the utmost care to prevent it from doing
> the harm.
>
> (2)  This liability is limited to harm that results
> from the abnormally dangerous propensity of which
> the possessor knows or has reason to know.

Thus, the present issue is whether the record evidence, viewed in the light most favorable to Plaintiffs, raises an issue of fact concerning whether Defendant had reason to know that Morgenrot and Spring Waltz could carry EHV-1 to Monmouth Park.[20]

Plaintiffs have pointed to sufficient record evidence raising a question of fact as to Defendant's "scienter." *DeRobertis*, 94 N.J. at 150-51, 155, 158.  In the six days prior to shipping Morgenrot and Spring Waltz, Defendant tested 14 of its horses for EHV-1 and three of its horses exhibited symptoms that were consistent with EHV-1.  This evidence, if believed by a jury, could support a reasonable inference that Defendant should have known that Spring Waltz and Morgenrot could carry EHV-1 to Monmouth Park.

Accordingly, Defendant's Motion for Summary Judgment as to Plaintiffs' common law strict liability claim will be denied.

---

[20]  There is no genuine dispute that carrying a contagious, potentially lethal infection such as EHV-1 is a dangerous propensity abnormal to thoroughbred racing horses, and that quarantine as a result of exposure to the carriers is a harm resulting from the dangerous propensity.

**B.**

Plaintiffs also assert two theories of negligence.  First, Plaintiffs assert "there is liability for negligence for shipping horses to Monmouth Park when Defendant had a strong suspicion that its stable was infected with a highly contagious lethal pathogen."  (Opposition Brief, p. 4)

Second, Plaintiffs assert that even if Defendant had no reason to believe that its horses carried EHV-1 when they were shipped to Monmouth Park, Defendant is independently liable for "the delay in notification" between when Defendant should have suspected that Spring Waltz and Morgenrot carried EHV-1 to Monmouth Park and when Dr. Keegan spoke to Dr. Duncan on October 22, 2006.  (Id. at p. 4, 15, 21)

**1.**

Plaintiffs' first negligence theory is substantially the same as their common law strict liability theory: Plaintiffs assert that Defendant owed them a duty of care which Defendant breached when it shipped Morgenrot and Spring Waltz when it should have known that the horses would carry EHV-1 to Monmouth Park.  In other words, Plaintiffs assert that a reasonable person in Defendant's position would have known that Spring Waltz and Morgenrot might transmit EHV-1 and would have kept them at Adena

18

Springs North.

Defendant attacks this theory on two grounds.  First, it argues that Defendant had no reason to suspect an EHV-1 outbreak at Adena Springs North until Northern Emperor was found down in his stall, which undisputedly occurred on October 13, 2006, i.e., after Spring Waltz and Morgenrot had already been shipped to Monmouth Park.  This argument has already been addressed in Section III., A., 2. *supra*.  The Court holds that Plaintiffs have put forth sufficient evidence to raise a triable issue of fact as to whether Defendant should have known, prior to October 12, 2006, that Morgenrot and Spring Waltz could carry EHV-1 to Monmouth Park.

Second, Defendant argues that the claim should fail because the Plaintiffs' claims for lost purses resulting from the quarantine are "vague, tenuous, and speculative."  (Moving Brief, p. 17)  The Court disagrees.  Plaintiffs' claims for lost purses are not so speculative as to prevent recovery of damages.[21]

---

[21]  Defendant does not articulate how the claim for lost purses is speculative, and it cites no law in support of its position.  Defendant merely emphasizes the undisputed fact that the EHV-1 Emergency Fund claims administrator rejected the individual Plaintiffs' claims for lost purses as hypothetical.  However, such a determination is not binding on this Court and in any event, is not tantamount to a legal conclusion concerning the adequacy of Plaintiffs' damages evidence under New Jersey law.
    Indeed, in its formal Report to the NJTHA Board, the Committee which administered the Emergency Fund explicitly recognized its limited role in this regard: "We understood that it was our job to determine the nature of any and all claims.  It was

The record evidence indicates that a given horse need only finish a race to earn money.  For example, Plaintiffs submit the race results from races on November 18th, 29th and 30th of 2006.  (Toerkelson Decl. Ex. G)  In the November 18th race, ten horses raced (and finished the race) and all ten horses collected money.  The race record breaks down the "value of [the] race" in the following manner: "1st $24,600; 2nd $8,200; 3rd $4,100; 4th $2,050; 5th $1,230; 6th $164; 7th $164; 8th $164; 9th $164; 10th $164."  (Id.)  Likewise, in the November 29th race seven horses raced with the following breakdown of winnings: "1st $27,000; 2nd $9,000; 3rd $4,500; 4th $2,250; 5th $1,350; 6th $450, 7th $450; and in the November 30th race, twelve horses raced with the following breakdown of winnings: "1st $24,600; 2nd $8,200; 3rd $4,100; 4th $2,050; 5th $1,230; 6th $118; 7th $118; 8th $118; 9th $118; 10th $118; 11th $118; 12th $112."  (Id.)

Moreover, racing histories, which apparently are maintained for every horse, can assist the jury in making a reasonable prediction on how a given horse would have performed or how much money they would have won in a given race.  Plaintiff Deckert submits the racing histories dating from August 5, 2006 to December 23, 2006 for eight of its horses.  (Torkelson Decl. Ex.

_____

not our job to determine the legal basis as to whether a potential loss is collectible through litigation but rather to determine if the claim should be paid from the funds allocated for relief." (Torkelson Decl. Ex. N)

F)  The histories indicate the type and distance for each race, as well as where the horse placed and how much money they earned. (Id.)  To give one example, Deckert's horse Tin God raced on August 27, 2006; September 14, 2006; October 5, 2006; and October 12, 2006; earning $430; $1020; $320; and $6400 respectively. (Torkelson Decl. Ex. F)  Tin God was subject to the quarantine and therefore did not race for the remainder of 2006.  (Id.)[22]

Similarly, Plaintiff ELR's horse, Those Shoes, was scratched[23] from a race at Delaware Park on October 23, 2006 due to the quarantine.  (McLean Decl. Ex. AA)  The record indicates that on October 7, 2006 at the Meadowlands, Those Shoes finished in first place.  (Id.)  In the first race after the quarantine, Those Shoes finished in 6th place (out of seven) and won $450. (Id.)[24]

---

[22]  Plaintiff Deckert also stated in its application for reimbursement from the EHV-1 emergency fund, "we had to scratch our horses in races where other horses could run, and instead of us being the favorite and winning, a horse below our quality won the race. . . . We lost out on a lot of money, that [we] could have won. . . . We should have won over $100,000.00 of purse money with the crew of horses that we have!"  (Torkelson Decl. Ex. F)

[23]  "'Scratch' means the act of withdrawing an entered horse from a race after the closing of overnight entries."  N.J.A.C. 13:70-2.1.

[24]  Plaintiff ELR argues that Those Shoes would have placed higher in the November 29th race if not for the quarantine which restricted Those Shoes' ability to train.  However, even if a reasonable juror were to reject that argument, he or she could nonetheless determine how much money Those Shoes would have won based on her performance before and after the quarantine.

At least two other of ELR's horses were similarly impacted by the quarantine.  Motor City Papa and Nomoremrniceguy were "on target to race in New York during the week of October 22, 2006" but did not race because of the quarantine.  (McLean Cert. Ex. AA)  Motor City Papa raced on October 27, 2006[25], placing in 6th place and earning $340; and raced on November 30, 2006, placing 5th and earning $1,230.  (Id.)  Nomoremrniceguy raced on November 18, 2006, also placing 5th and earning $1,230.  (Id.)

In light of the foregoing undisputed evidence, the Court concludes that Plaintiffs' lost purse earnings are analogous to lost profits.  With regard to lost profits, the Appellate Division has explained,

> [New Jersey courts] do permit considerable speculation by the trier of fact as to damages. In *Tessmar v. Grosner*, 23 N.J. 193, 128 A.2d 467 (1957), the Court stated that '[t]he rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery.' *Id.* at 203, 128 A.2d 467 (citations omitted). Although we require a reasonably accurate and fair basis for the computation of alleged lost profits, . . . the fact that a plaintiff may not be able to fix its damages with precision will not preclude recovery of

---

[25]  Horses who showed no signs of potential infection were allowed to race at the Meadowlands despite the quarantine but were not permitted to race elsewhere.  (Torkelson Decl. Ex. A)  Thus, it appears that Motor City Papa was allowed to race at the Meadowlands on October 27th even though it was not allowed to race in New York during that same week.

damages. . . . In *Stanley Co. of America v. Hercules Powder Co.*, 16 N.J. 295, 314, 108 A.2d 616 (1954), the Court stated the rule as follows: 'Loss of profits, where based on sound fact and not on mere opinion evidence without factual support, is recognized as a proper measure of damages if capable of being estimated with a reasonable degree of certainty.' . . . .

Past experience of an ongoing, successful business provides a reasonable basis for the computation of lost profits with a satisfactory degree of definiteness.

*V.A.L. Floors, Inc. v. Westminster Communities, Inc.*, 355 N.J. Super. 416, 424-25 (App. Div. 2002). The Court concludes that Plaintiffs have put forth sufficient evidence from which a jury could estimate damages with a reasonable degree of certainty.[26]

Accordingly, Defendant's Motion for Summary Judgment as to Plaintiffs' first negligence theory will be denied.

## 2.

Plaintiffs also argue that Defendant breached its duty to

---

[26]  In addition to lost purses, Plaintiff ELR claims lost profits from the sale of its horse Doll Baby. "Doll Baby was entered to sell at the November 5, 2006 Fasig - Tipton Selected Mixed Sale in Lexington, [Kentucky]. Because of the [quarantine] she was confined to Monmouth Park [and ELR] was forced to withdraw her." (McLean Decl. Ex. AA) Doll Baby was later sold in January for a lower price. According to ELR, the November sale in Kentucky, which followed the Breeder's Cup, was more "prestigious" and "attract[ed] the top level buyers," whereas the sale venue in January did not attract the same level of buyers. (Id.) Defendant makes no argument as to this claim for damages. Accordingly, the Court makes no ruling as to the claim for lost profits from the sale of Doll Baby.

timely warn Monmouth Park officials that Morgenrot and Spring Waltz may have carried EHV-1 from Adena Springs North to Monmouth Park.

A reasonable juror could conclude that Defendant should have suspected earlier that Spring Waltz and Morgenrot may have carried EHV-1 to Monmouth Park, and therefore should have warned Monmouth Park officials earlier.  Construing the record in the light most favorable to Plaintiffs, by October 14th, Defendant: (1) knew that Northern Emperor had been found down in his stall and was euthanized; (2) knew that Spring Waltz was running a high fever; and (3) decided to quarantine the entire barn where Northern Emperor and three other febrile horses were housed. These facts taken together support the reasonable conclusion that on October 14th Defendant should have suspected that Spring Waltz and Morgenrot carried EHV-1 to Monmouth Park.[27]

---

[27]  Without citing to any authority, Defendant asserts that it only had a duty to notify Monmouth Park officials of a *confirmed* diagnosis of EHV-1 at Adena Springs North that may have been carried to Monmouth Park; that it had no duty to warn of a *suspected* EHV-1 infection that may have been carried to Monmouth Park.  The Court disagrees.

*Snyder v. American Association of Blood Banks* is instructive. 144 N.J. 269 (1996).  In that case, a patient contracted HIV from a blood transfusion during open-heart surgery and sued the blood bank that provided the blood for negligence.  At the time of the surgery in 1984, it had not been conclusively established that "blood and blood products could carry the HIV virus."  *Id.* at 280. However, after examining all of the historical medical evidence, the Court held that in 1984 the blood bank "should have foreseen that a blood transfusion could transmit AIDS" and therefore the blood bank should have used an available screening test for its

24

Moreover, a reasonable juror could find that by failing to inform Dr. Keegan (Monmouth Park's veterinarian) of those facts until eight days later (October 22nd), Defendant breached its duty to timely warn Monmouth Park of the suspected transmission.

Defendant argues that the delay in notification claim nevertheless fails for lack of proximate cause. Defendant claims that Plaintiffs cannot prove that an earlier warning would have shortened the duration of the quarantine or narrowed the scope of the quarantine. However, issues of disputed fact preclude summary judgment for Defendant on this issue.

Plaintiffs' expert, Dr. Osterreider, testified that earlier notification would have resulted in the immediate isolation of Morgenrot and Spring Waltz, which could have shortened the quarantine period by "prevent[ing] the appearance or the creation of new sick horses." (Torkelson Decl. Ex. W-- Osterreider Dep. p. 117-18) This evidence is sufficient to raise a question of

---

blood. *Id.* at 294.

The blood bank argued that because the evidence of HIV transmission through blood transfusions in 1984 was "inconclusive" it owed no duty to the patient. *Snyder*, 144 N.J. at 294. The New Jersey Supreme Court rejected that argument, explaining, "[t]he foreseeability, not the conclusiveness, of the harm suffices to give rise to a duty of care." *Id.*

This case is analogous to *Snyder*. The undisputed fact that on October 14, 2006 Defendant did not have a confirmed diagnosis of EHV-1 does not preclude the imposition of a duty to warn. Indeed, the Court sees no difference in the foreseeability of harm to Plaintiffs when Defendant should have reasonably suspected EVH-1 and when Defendant had a confirmed diagnosis of EHV-1.

material fact as to proximate cause.

Defendant's Motion for Summary Judgment as to Plaintiffs' second negligence theory will be denied.[28]

**C.**

Lastly, Defendant argues that Plaintiff NJTHA lacks standing to sue, either in its own right or based on organizational standing on behalf of its members.  Both arguments fail.

**1.**

NJTHA seeks to recover money damages for injuries to itself. Specifically, the Second Amended Complaint alleges, "[a]s a result of the quarantine, the NJTHA itself has sustained loss and damage, due to reduction in its funding derived from percentages of wagers placed at the Meadowlands Race Track caused by the quarantine."  (Second Amended Complaint ¶ 19, J.)[29]  Plaintiffs allege that "the number of thoroughbred horses competing at The

---

[28]  The Court's holding that Plaintiffs' lost purses damages are not too speculative applies to this theory of negligence as well.

[29]  Defendant apparently believes NJTHA asserts other injuries to itself, but the Second Amended Complaint is clear.  It alleges that the quarantine caused many different injuries *to New Jersey horse owners and trainers* (see Second Amended Complaint ¶ 19, A.-I.) (emphasis added), and one injury to NJTHA itself, to wit., reduction in its funding.  (Second Amended Complaint ¶ 19, J.)

Meadowlands during the quarantine was significantly curtailed, proximately causing a drop in attendance [and] a reduction in wagering ('handle')."  (Id. ¶ 19, G.)

Defendant argues that NJTHA lacks standing to pursue this claim because it "cannot establish that the association itself has suffered an injury in fact."  (Moving Brief p. 21)  "Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010).  NJTHA satisfies all three elements.

NJTHA asserts that it lost money in the form of reduced funding because wagers decreased during the quarantine.  This injury is concrete, specific to NJTHA, and actual.

Such injury is also traceable to Defendant's alleged failure to timely warn Monmouth Park officials of the possible spread of EHV-1 to Monmouth Park.  The record viewed in the light most favorable to Plaintiffs supports the reasonable conclusion that earlier notification could have significantly reduced the scope of the quarantine, thereby decreasing the number of horses quarantined and increasing the number of horses available to race at other New Jersey venues (most notably the Meadowlands), thereby increasing the overall wagers placed due to increased

27

attendance at races.

Such injury also can be easily redressed by a favorable ruling.  NJTHA asserts that it lost money.  A money judgment with interest will fully compensate NJTHA.

Defendant's Motion for Summary Judgment will be denied as to Plaintiff's standing to pursue its claim for its own lost funding it allegedly suffered as a result of the quarantine.

**2.**

NJTHA also seeks redress for the many alleged injuries to its members-- horse owners and trainers-- resulting from the quarantine.  First, like individual Plaintiffs ELR and Deckert, NJTHA (on behalf of its members that were affected by the quarantine) also seeks to recover lost purses.  (Second Amended Complaint, ¶ 19, A.)  Second, similar to its own individual claim, NJTHA asserts that the decrease in wagers at the Meadowlands resulted in lower revenues for owners and trainers. (Id. ¶ 19, G.)  Third, NJTHA seeks to recoup the payments made out of the Emergency Fund (Id. ¶ 19., B., E.).[30]  With regard to

---

[30]  The record is clear that the Emergency Fund, at its inception, was created in anticipation of litigation with Defendant.  On November 13, 2006, (i.e., while the quarantine was still in effect) NJTHA's Executive Director wrote to the New Jersey Racing Commission asking that the 2006 purse underpayment be used to compensate those directly affected by the quarantine. (Torkelson Decl. Ex. N)  That letter stated that any person making

these claims, NJTHA is acting solely as a representative for its affected members, apparently including the individual Plaintiffs.

The three-pronged test for associational standing is well-established.  An association has standing to bring claims solely as a representative of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *see also Int'l Union, UAW v. Brock*, 477 U.S. 274, 282 (1986) (quoting *Hunt*); *Pa. Prison Soc'y v. Cortes*, 622 F.3d 215, 228 (3d Cir. 2010) (quoting *Hunt*).

Defendant only contests the third prong of the *Hunt* test. It argues that because this is a tort action seeking money damages, participation by NJTHA's individual members will be required.  According to Defendant, "the established rule is that associations bringing suit on behalf of their members have standing to bring claims only for injunctive or declaratory relief."  (Moving brief, p. 23)

---

a claim against the fund "will be required to assign his/her right to attempt to recover damages from Adena Springs North to the NJTHA.  NJTHA has retained [counsel] to evaluate pursuing a cause of action." (Id.)

The Court does not agree that an association can never have standing to recover money damages on behalf of its members. Rather, Third Circuit precedent precludes organizational standing when the claims asserted or relief sought will require proving "*individualized* damages," *Hospital Council of Western Pennsylvania v. City of Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991) (emphasis added), through the use of "'individualized proof,'" *Pennsylvania Psychiatric Society v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 285 n.5 (3d Cir. 2002)[31], thereby requiring extensive participation of "each allegedly injured" member of the association.  *Hospital Council*, 949 F.2d at 90.

In this case, Plaintiffs assert (and Defendant apparently does not dispute) that the lost purses it seeks to recover is a "lump sum" which would have increased the total 2006 purse but for the quarantine.  Plaintiffs further explain that individual participation of members will not be required to determine "who is owed what" from NJTHA's potential recovery of lost purses or amounts paid out of the Emergency Fund because individual payouts can be determined from the records of the Meadowlands and the NJTHA.  (Opposition Brief, p. 10-11)  Thus, the Court concludes that participation in this suit by each of NJTHA's members will

---

[31]  Quoting *Retired Chicago Police Association v. City of Chicago*, 7 F.3d 584, 601-02 (7th Cir. 1993).

not be required, and therefore NJTHA has associational standing.

Alternatively, the associational standing issue has been mooted by the NJTHA members' assignment of rights. *See Warth v. Seldin,* 422 U.S. 490, 515 (1975) ("here an association seeks relief in damages for alleged injuries to its members.  Home Builders alleges no monetary injury to itself, *nor any assignment of the damages claims of its members*.  No award therefore can be made *to the association as such.*") (emphasis added).  Each person and organization who submitted a claim to the NJTHA's EHV-1 Emergency Relief Fund specifically assigned to NJTHA their claims against Adena Springs North.  The first page of the 2006 EHV1 Emergent Relief Application form provides:

> I hereby acknowledge that by signing this request I hereby assign all my rights to seek redress from Adena Springs North . . . to the NJTHA, Inc.  I hereby agree that I will cooperate with the NJTHA, Inc. and its counsel in any action to recover funds from Adena Springs North or any other party in connection with EHV1 Herpes Virus at Monmouth Park in 2006.  I agree that I assign all my rights to the NJTHA, Inc. and shall not take any actions inconsistent with the assignment of rights to the NJTHA, Inc.

(Torkelson Decl. Exs. E, F, G)

It is undisputed that the individual NJTHA members have standing to pursue the claims asserted, therefore NJTHA has standing by virtue of its members' assignment of their claims against Defendant to Plaintiff NJTHA.  *See Misic v. Building Service Employees Health and Welfare Trust,* 789 F.2d 1374, 1378

(9th Cir. 1986) ("Many cases reflect the premise that a valid assignment confers upon the assignee standing to sue in place of the assignor.") (collecting cases).[32]  Accordingly, Defendant's Motion for Summary Judgment with regard to NJTHA's associational standing will be denied.

## IV.

In light of the foregoing, Defendant's Motion for Summary will be granted as to Plaintiffs' strict liability claim premised upon the Trainer Responsibility Rule, and denied in all other respects.

An appropriate Order accompanies this Opinion.


May 2nd, 2013                    s/ Joseph E. Irenas
                          _____
                          JOSEPH E. IRENAS
                          Senior United States District Judge


---

[32]  *See also APCC Servs., Inc. v. AT&T Corp.*, 281 F. Supp.2d 41, 47 (D.D.C. 2003) ("the assignment . . . conveys to the assignee not merely the power to assert a claim on another's behalf, but also the right to vindicate a legal wrong done to the assignor *as if* that wrong had been done to the assignee itself.") (emphasis in original), *reversed on other grounds by APCC Servs. v. Sprint Commun. Co.*, 418 F.3d 1238 (D.C. Cir. 2005).